**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION AT COVINGTON**

CIVIL ACTION NO. 2:17-cv-97 (WOB-EBA)

ROBERT YOUNG                                                                 PLAINTIFF

VS.

CAMPBELL COUNTY, KY, ET AL.                                              DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

      This 42 U.S.C. § 1983 case arises from a prison fight that occurred between Plaintiff

Robert Young and another inmate at the Campbell County Detention Center (CCDC). Plaintiff

asserts Defendants violated his constitutional rights by placing him in a cell with the inmate and

by failing to timely administer medical aid after the fight.

      This matter is before the Court on Defendants' Motion for Summary Judgment (Doc. 38)

and Defendants' Motion to Strike Plaintiff's Expert (Doc. 39). The Court previously heard oral

argument on these motions and took the matters under submission. After further study, the Court

issues the following Memorandum Opinion and Order. The Court finds that while Plaintiff's

expert is qualified to testify, Defendants are entitled to summary judgment and thus Defendants'

Motion for Summary Judgment is **GRANTED.**

    **I.**    **Factual and Procedural Background**

      **A.**  **<u>Campbell County Detention Center Booking and Classification Procedures</u>**

When an inmate is admitted to the CCDC, a classification officer assigns the inmate a "classification" level. (Doc. 45 at 8). There are five classification levels: minimum, medium, maximum, special status, and protective custody. (*Id.*). The CCDC has a written classification policy (Doc. 54-10) and Post Orders (Doc. 54-11) outlining the policy and its objectives. (Doc. 54-10 at 2, 5). These written policies require classification officers "to ensure all inmates are correctly classified using the established guidelines of the facility and assigning housing locations based on those findings" and to "[r]eclassify inmates either due to a request made by the inmate or a change in the inmate's charge/behavior status." (Doc. 54-11 at 1, 4).

The classification officer is required to examine the inmate's background as part of the classification process. The classification officer verifies why the inmate was arrested. (Doc. 45 at 8). The classification officer consults the CCDC's "JailTracker" database, which contains incident reports of past misbehavior at the CCDC. (*Id.* at 12-13). The classification officer also examines "CourtNet," which is a state database containing information about any previous in-state incarcerations. (Doc. 42 at 4, 9). Lastly, the classification officer will meet face-to-face with the inmate and ask probing questions about their background, including criminal history, family life, and health issues. (*Id.* at 7).

A classification officer can also reclassify an inmate if such a change is warranted; while jail staff can recommend an inmate be reclassified, ultimately the determination is left to the classification officer. (*Id.* at 20, 34). None of the CCDC's classification officers are party to this lawsuit. (Doc. 38 at 3).

**B.  Background of Ka and Plaintiff**

Plaintiff Robert Young was booked into the CCDC for drug possession and assigned a minimum classification level. (Doc. 40 at 5; Doc. 54-2). Papa Ka was booked into the CCDC for

drug possession and possession of a handgun by a felon and was also assigned a minimum

classification level. (Doc. 54-3).

   While an inmate at the CCDC in 2017, Papa Ka was disciplined numerous times:

- On April 13, he was removed from his cell for cursing at jail staff after a cell
  search. (Doc. 38-10).

- On April 14, he was placed in isolation for three days for smoking an e-cigarette
  in court. (Doc. 38-11).

- On April 30, he was disciplined for failing to pull up his pants and for
  misidentifying himself to a deputy. (Doc. 38-12).

- On May 1, his blanket was taken away because he refused to fold it up. (Doc. 38-
  13).

- On May 2, he was placed in isolation for refusing to go to the recreational yard
  during recreation time. (Doc. 38-14).

- On May 13, two inmates housed in a cell with Ka alleged that Ka was threatening
  and harassing them. Other inmates in the cell alleged those two inmates made up
  the story about Ka in order to leave the cell with commissary items the two
  inmates had stolen from the others in the cell. Since the accusations against Ka
  were uncorroborated, no disciplinary action was taken against Ka, although he
  was moved to a different cell. (Doc. 38-15).

- On May 15, he was disciplined for refusing to remove a sheet wrapped around his
  head and for throwing objects at the cell door. Additionally, he was disciplined
  for keeping several writing pens in violation of the CCDC's rules. (Doc. 38-16).

- On May 15, after he had been moved to isolation for the sheet-and-pen incident,
  he started to kick his cell door. When deputies came to investigate, he acted
  aggressively and was eventually placed into a restraint chair. (Doc. 38-17).

- On May 20, Ka was found fighting another inmate, and officers had to break up
  the fight with pepper spray. (Doc. 38-18).

Defendant Sergeant Mischell, following the May 20 fight, recommended that Ka be reclassified

to a higher classification level. (Doc. 38-18 at 2).

   **C. <u>Beating of Plaintiff</u>**

Despite Sergeant Mischell's recommendation, Ka was not reclassified; both Ka and Plaintiff were assigned to cell 220 in June 2016. (Doc. 40 at 10). At some point, Ka stole commissary items from Plaintiff while Plaintiff was sleeping. (*Id.* at 11). Several days later, an inmate stole the items back from Ka and returned them to Plaintiff. (*Id.*). On the morning of June 15, 2016, Papa Ka and another inmate named Chapman confronted Plaintiff about the items and began to provoke Plaintiff into fighting Ka in the cell's shower. (*Id.* at 12). The shower has a privacy curtain that shields the view from the cell's security cameras. (*Id.* at 13). Papa Ka and Chapman implied Plaintiff would be "jumped" if he did not fight Ka, so Plaintiff stepped inside the shower with Ka. (*Id.* at 12-14). Ka first punched Plaintiff in the right eye; Plaintiff then grabbed Ka in a "bear hug," and the two fell to the ground. (*Id.*). Ka landed on Plaintiff's knee and proceeded to beat Plaintiff, causing him to lose consciousness. (*Id.* at 14-15).

After Ka attacked him, Plaintiff was able to walk back to his bunk unassisted. (*Id.* at 15). He did not tell anyone of the fight until the morning of June 18, three days after the assault.[1] (*Id.* at 17). He stated he did not ask for help because he was unconscious and sleeping the entire three days. (*Id.* at 15). He did eat, but only because Chapman woke him to give him meals. (*Id.*). He does not know why Chapman helped him eat. (*Id.* at 16). Plaintiff also used the restroom but had to limp on one foot to reach the cell's toilet, six feet away from his bunk. (*Id.* at 16).

When pressed about why he did not ask for help, Plaintiff alleged that Chapman was sleeping on a "boat" – a type of makeshift cot – between him and the door. (*Id.*). While Chapman never physically prevented Plaintiff from asking for help, Chapman's presence deterred Plaintiff from seeking assistance. (*Id.* at 16-17).

### D. **The Next Three Days After the Assault**

---

[1] There is some ambiguity whether the assault happened on June 15 or June 16, 2016. This Opinion assumes the assault happened on June 15, 2016. (Doc. 38 at 8).

During the three days after the fight, Defendants performed several types of "passes" to and near Plaintiff's cell. There are several types of "passes" at the CCDC: supervisory inspections, headcounts, observational scans, meal passes, and medication passes.

A "supervisory pass" is only performed by a shift supervisor. While each supervisor would perform the pass slightly differently, they basically walked to each area under their supervision to see if anything was amiss. (Doc. 41 at 5; Doc. 44 at 25; Doc. 46 at 6). They would step into a cell if something seemed off. (Doc. 46 at 6).

"Headcounts" are different from supervisory passes. Deputies perform headcounts several times during a twelve-hour shift. (Doc. 56 at 20). During a headcount, the deputy physically enters each cell individually, calls out the inmate's name, gets a verbal confirmation from the inmate, and then checks the inmate's wristband photo. (Doc. 56 at 12, 15, 18; Doc. 57 at 23; Doc. 59 at 21-22). Inmates can stay in their bunks during headcount; however, the deputy physically walks to the bunk to check the inmate's wristband. (Doc. 56 at 19-20; Doc. 57 at 19; Doc. 58 at 75).

"Observational scans" are different from supervisory scans or headcounts. Deputies perform an hourly observational check in addition to performing headcounts. (Doc. 44 at 26; Doc. 56 at 32). The deputy looks at each inmate to make sure the inmate is uninjured. (Doc. 44 at 26). The deputy may or may not enter the cell. (Doc. 56 at 34-35; Doc. 59 at 24-25).

During a "meal pass," an inmate comes to the door of the cell to receive three daily meals. (Doc. 41 at 20). The deputy looks at each inmate and their wristband, checks them off a list, and then distributes the meal. (Doc. 41 at 20; Doc. 59 at 52-53). Meals are supposed to be passed out individually to each inmate; other inmates are not supposed to distribute them to other inmates. (Doc. 44 at 24; Doc. 56 at 22). However, some of the deputies would allow an inmate to

collect another inmate's meal if the inmate specifically told the deputy to give the food away. (Doc. 57 at 27-28). However, the inmate would have to visibly and unambiguously assent to the transfer. (*Id.* at 29).

During a "medication pass," a deputy goes to each cell with a nurse to distribute medication. (Doc. 41 at 8). The deputy calls out the inmate's name and identifies them using their wristband. (*Id.*). The nurse then distributes the medication and the deputy watches as the inmate takes the medicine. (Doc. 41 at 8).

Defendants performed various passes by cell 220 during the three days after the assault. Defendant Sergeant Mischell was the shift supervisor on June 17 from 7:00 a.m. to 7:00 p.m. (Doc. 41 at 5). She also was shift supervisor on June 18 at 7:00 a.m. (Doc. 41 at 9). During her shift on June 17, she did three supervisory passes of the area that included cell 220 (known as Back Pod 2). (Doc. 46 at 7; Doc. 38-27). She does not remember seeing Plaintiff. (Doc. 41 at 8, 15, 17, 41).

Defendant Sergeant Wright was the shift supervisor on both June 15 and June 17, working from 7:00 p.m. until 7:00 a.m. the following day. (Doc. 38 at 27). On her first shift, she completed three supervisory passes of Back Pod 2. (*Id.*). On her second shift she did two supervisory passes of Back Pod 2. (*Id.*). She does not remember Plaintiff. (Doc. 52 at 13).

Defendant Sergeant Lohr was the shift supervisor from June 17 to June 18 from 7:00 p.m. to 7:00 a.m. (Doc. 38 at 27). He completed three supervisory passes of Back Pod 2. (*Id.*). He does not remember Plaintiff. (Doc. 44 at 19, 29).

Defendant Deputy Denney was placed on duty at Back Pod 2 for part of two, 12-hour shifts he worked on June 15 and June 16. (Doc. 38 at 27). During the June 15 shift, he performed three observational scans at; performed a meal pass; and performed a medical pass. (*Id.*). On

June 16, he performed a headcount of Back Pod 2; performed four observational scans; and performed a meal and medical pass. (*Id.*). He does not remember Plaintiff. (Doc. 56 at 40-41).

Defendant Deputy Henning was a deputy placed on duty at Back Pod 2 for the second half of his 12-hour shift on June 17. (Doc. 38 at 27). He performed five observational passes, a meal pass, and a diabetic snack pass. (*Id.*). He does not remember Plaintiff. (Doc. 57 at 30-32).

Defendant Deputy Snider worked a shift on June 17 from 7:00 a.m. to 7:00 p.m., but he was not assigned to Back Pod 2. (Doc. 38 at 27). However, he may have covered Back Pod 2 when the assigned deputies went on break or lunch. He does not remember Plaintiff. (Doc. 59 at 19, 21, 42, 44, 48).

Defendant Deputy Fassler was assigned to Back Pod 2 during his shift on June 17 from 7:00 a.m. to 7:00 p.m. but did not perform any observational scans. (Doc. 38 at 27). He does not remember Plaintiff.[2] (Doc. 58 at 45, 74-75).

Records show between the time that Plaintiff was assaulted and discovered, his wristband was scanned for headcounts and meals were distributed to him. (Doc. 41 at 21; Doc. 58 at 77-78). As the CCDC does not restrict bed use, an inmate can stay in bed all day if they choose. (Doc. 59 at 26). Officers would not typically bother an inmate if he appeared to be sleeping. (Doc. 59 at 50).

**E. Finding Plaintiff**

On June 18th, Officer Hartman performed a medical pass and called for Plaintiff to come receive his anxiety medication. (Doc. 60 at 67). Plaintiff said he was not getting out of bed to receive his anxiety medicine, so Hartman instructed Plaintiff to sign a refusal form. (*Id.*). As

---

[2] All Defendants testified during their depositions that they could not remember Plaintiff. All their depositions occurred over two years after the altercation between Ka and Plaintiff in June of 2016. (Doc. 41, 44, 46, 56, 57, 58, 59).

Plaintiff stood up from his bunk and approached the door to sign the refusal form, Hartman noticed that Plaintiff had a black eye and was limping. (*Id.* at 67-69). Hartman immediately notified his supervisors of the injuries, and Plaintiff was taken out of the cell and described what happened. (Doc. 41 at 15). Plaintiff was immediately sent to medical. (Doc. 40 at 17-18). In addition to his black eye, doctors later diagnosed Plaintiff with a tibial plateau fracture in his left knee. (Doc. 38-25). Plaintiff was not examined for a concussion. (Doc. 40 at 20).

## II. Analysis

### A. The Motion to Strike Plaintiff's Expert is denied because the Expert's experience and education qualify him as an expert, and his testimony is sufficiently reliable.

The parties dispute whether Harry McCann is qualified to render expert opinion on jail classification and supervision, and whether his opinion is reliable. While Defendants point out several issues with McCann's qualifications that arguably undermine his credibility, McCann's experience and education qualify him to testify about jail classification and supervision. Additionally, his opinion is sufficiently reliable as it is based on nationally recognized standards.

An expert witness must first be qualified. Fed. R. Evid. 702. An individual may be qualified by knowledge, skill, experience, training, or education. *Id.* Thus, Plaintiff's proffered expert must be qualified by knowledge, skill, experience, training, or education with respect to jail classification and supervision.

McCann's deposition and supporting affidavits show that he is qualified to testify about jail classification and supervision. McCann has taught classification processes to students at community college and to established corrections officers. (Doc. 53-1 at 1; Doc. 48 at 5). He has experience with probation and parole classification, which he states is similar to the classification processes of a jail. (Doc. 48 at 6, 28; Doc. 53-1 at 1, 2). McCann has taught basic training to

correctional officers and has experience developing training programs on how to properly supervise inmates. (Doc. 48 at 3-4; Doc. 53-3 at 17; Doc. 53 at 13).

Defendants argue McCann is not qualified to testify about classification standards and jail supervision, citing a lack of practical experience and outdated academic experience. However, these arguments go towards the weight of his testimony, not admissibility. *See Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 596 F. Supp. 2d 1101, 1122 (M.D. Tenn. 2009); *see also Alvarado v. Oakland Cty.*, 809 F. Supp. 2d 680, 692 (E.D. Mich. 2011). Because of his teaching experience and his experience in classification systems, McCann is qualified to testify with respect to jail classification and supervision.

McCann's opinion must also be reliable. Fed. R. Evid. 702. Defendants argue McCann's testimony is unreliable. When a party questions whether an expert's opinion is reliable, the court must determine whether: (1) the proposed testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and that (3) the expert apply the principles and methods reliably to the facts of the case. *Id.* This application is "flexible," and a district court has "broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination.*" Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

McCann relied on nationally recognized standards in forming his opinions, and thus his testimony is not unreliable. McCann plainly states that his opinions are based on the "development of policies and procedures in correctional and law enforcement organizations…". (Doc. 38-32 at 9). Those organizations and standards include the National Advisory Committee on Criminal Justice Standards, the National Institute of Corrections, and the American Correctional Association standards. (Doc. 38-32 at 9; Doc. 48-2).

McCann is qualified and his opinion is reliable. Consequently the Motion to Strike Plaintiff's Expert is denied.

**B. Summary judgment is granted because no constitutional violation occurred.**

While Plaintiff's proffered expert is qualified and his testimony is reliable, the Court finds no constitutional violation occurred. A defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Vanderhoef v. Dixon*, 938 F.3d 271, 276 (6th Cir. 2019). As no constitutional violation occurred, and no action is attributable to Campbell County, summary judgment is granted in Defendants favor.

1. <u>**Defendants are entitled to qualified immunity for the failure to protect claim because they did not act with deliberate indifference.**</u>

Plaintiff asserts a § 1983 claim against Defendants Mischell and Lohr in their individual capacities for failing to protect him from a substantial risk of harm. However, they are entitled to qualified immunity because no constitutional violation occurred. The Eighth Amendment obligates prison officials to take reasonable steps to protect and prevent harm to inmates. *See Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984). To establish that prison officials violated the Eighth Amendment by failing to protect or prevent harm, an inmate must show (1) their incarceration is "under conditions posing a substantial risk of serious harm" and (2) the official must have been "deliberately indifferent" to inmate health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

Deliberate indifference, the second element, requires a "sufficiently culpable state of mind" wherein the "official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference." *Curry v. Scott*, 249 F.3d 493, 506 (6th Cir. 2001) (quoting *Farmer*, 511 U.S. at 837). Deliberate indifference "requires a level of culpability higher than negligence, one that more closely approximates reckless disregard for a known risk." *Grabow v. County of Macomb*, 580 Fed. Appx. 300, 310 (6th Cir. 2014). Plaintiff can prove deliberate indifference by direct or circumstantial evidence. *See Curry*, 249 F.3d at 506-507. However, an official is not deliberately indifferent to inmate health if the official responds reasonably in face of a known risk, even if the harm threatened was ultimately not averted. *Hearington v. Pandya*, 689 Fed. Appx. 422, 427 (6th Cir. 2017); *Farmer*, 511 U.S. at 842-44.

Defendants Mischell and Lohr are entitled to qualified immunity under § 1983 because they responded reasonably to any perceived risk Ka posed to other inmates. Mischell was aware of several incidents of Ka's misbehavior. She disciplined Ka for cussing at jail staff and smoking in a courtroom with an e-cigarette. She was aware of the incident when Ka was forced into a restraint chair. She disciplined Ka after he was pepper sprayed for fighting another inmate. However, she did not disregard this information; rather, she submitted reports to the classification officers after each incident and recommended that Ka be reclassified after he was pepper sprayed. (Doc. 41 at 56, 96). Sergeants can only recommend that an inmate be reclassified; only classification officers can do so. Mischell's actions simply do not indicate a deliberate indifference to any risk Ka posed to other inmates.

Lohr had less of a basis to recognize that Ka posed a dangerous risk. Lohr was aware that Ka was an "inmate that was problematic" and that Ka had "a tough time staying in one place in the jail." (Doc. 44 at 15). However, the only incident that arguably indicated to Lohr that Ka posed a risk to other inmates was when Ka was accused of extorting and threatening several of

his fellow inmates. (Doc. 38-15). In response to that incident, Lohr moved Ka to a different cell. This action also does not exhibit deliberate indifference.

As neither Mischell nor Lohr exhibited deliberate indifference, they are entitled to qualified immunity.

**2.** **Defendants are entitled to qualified immunity for the failure to provide adequate medical care claim because they did not act with deliberate indifference.**

Plaintiff is suing Defendants Wright, Lohr, Mischell, Denney, Henning, Snider, and Fassler under § 1983 in their individual capacities for deliberate indifference in failing to address his medical needs after Papa Ka assaulted him. Plaintiff alleges that these Defendants saw Plaintiff in his injured state and were deliberately indifferent to his need to obtain medical attention.

An inmate has a constitutional right to receive medical care while in custody. *Estelle v. Gamble,* 429 U.S. 97, 103 (1976). A plaintiff must establish two elements to succeed on such a claim: (1) a sufficiently serious medical need actually existed, and (2) the officials had a culpable state of mind, in that they were deliberately indifferent to the need of the plaintiff to receive medical attention. *Blackmore v. Kalamazoo Cty*., 390 F.3d 890, 895-97 (6th Cir. 2004).

The first element consists of a two-part inquiry: first, the court should determine whether the injury is "obvious," meaning "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 897 (quoting *Gaudreault v. Municipality of Salem*, 923 F.2d 203, 208 (1st Cir. 1990)).

Defendants do not seem to contest the first element, although it seems ambiguous whether Plaintiff's injuries were "obvious" or "serious" enough such that a lay person would have recognized the necessity for a doctor's attention. Plaintiff's injuries consisted of a black eye

and a fractured knee. Courts have consistently held that black eyes and other minor facial injuries are insufficiently serious for a deliberate indifference claim. *See Cain v. Irvin,* 286 F. App'x 920, 927 (6th Cir. 2008) (finding a swollen eye as insufficiently serious for a deliberate indifference claim); *Gonzalez v. Lusardi*, 930 F. Supp. 2d 840, 854–55 (E.D. Ky. 2013) (finding a black eye insufficiently serious for a deliberate indifference claim); *Powell v. Fugate*, 364 F. Supp. 3d 709, 728 (E.D. Ky. 2019) (finding swollen black eyes and a "busted" lip insufficiently serious injuries for an indeliberate indifference claim); *see also Ford v. Davis*, 878 F. Supp. 1124, 1130 (N.D. Il. 1995) (holding that a swollen face, two black eyes, bruised ribs and a bruised back were not "serious wounds"); *Dallio v. Hebert*, 678 F. Supp. 2d 35, 60 (N.D.N.Y. 2009) (holding that two black eyes, bruising on torso, and open lacerations on body were insufficient to establish a serious medical need).

Even if the injury is minor or non-obvious, it still may be the basis for a deliberate indifference claim if there is medical evidence demonstrating that the delay in treatment caused additional injury. *Cain*, 286 F. App'x at 926-27. However, the record does not indicate that Plaintiff's facial injuries worsened because of any delay in treatment. Thus even if Defendants did perceive that Plaintiff had a black eye, it cannot be the basis for a failure to provide medical assistance claim.

Plaintiff's other injury was a fractured knee. While a fractured knee is a more serious injury than a black eye, Defendants are still entitled to qualified immunity. The second element of a failure to provide medical assistance claim is the subjective component. This element requires an inmate to show that prison officials have "a sufficiently culpable state of mind in denying medical care." *Farmer*, 511 U.S. at 834. "To satisfy the subjective component, the plaintiff must allege facts which, if true, would show that the official being sued subjectively

perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

For example, in *Blackmore*, the court found an obvious injury existed when the inmate "exhibited obvious manifestations of pain and injury" when he complained directly to the supervising officers of sharp and severe stomach pains and when he vomited inside his cell. *Blackmore*, 390 F.3d at 899. Despite this "clear manifestation of internal physical disorder," the inmate did not receive medical attention for his appendicitis for over two days. *Id.* Additionally, in *Garretson*, the arrested individual informed police during her booking that she was an insulin-dependent diabetic, but the police failed to provide insulin for a full day. *Garretson v. City of Madison Heights*, 407 F.3d 789-795 (6th Cir. 2005).

The officers in those cases were clearly aware that the inmates needed care, either because of clear physical symptoms or because the plaintiff directly informed the officers. In this case, neither happened. Plaintiff testified that he stayed in bed for the three days after the assault and did not get up except to use the toilet, so it would have been difficult for officers performing passes to perceive any limp in Plaintiff's walk as he crossed the six feet from his bunk to the toilet. (Doc. 40 at 15). Inmates could stay in bed all day, and thus the mere fact that Plaintiff stayed in his bunk would not have raised any red flags to officers passing by the cell. Indeed, some of the deputies and sergeants would not have disturbed an inmate who appeared to be sleeping. Lastly, Plaintiff never asked for help or told officers of the pain he was experiencing. There is no evidence that the officers were subjectively aware of Plaintiff's knee injury.

Therefore, Defendants Wright, Lohr, Mischell, Denney, Henning, Snider, and Fassler are entitled to qualified immunity from Plaintiff's failure to provide medical care.

**3. Jailer James Daley is entitled to qualified immunity in his individual capacity from all of Plaintiff's claims because there is no evidence that he ratified or authorized any allegedly unconstitutional conduct.**

Plaintiff is suing Jailer James Daley in his individual capacity and in his official capacity. An official capacity claim is effectively a suit against the entity. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). Accordingly, any claims against Daley in his official capacity are claims against the County. With respect to the claims against him in his individual capacity, Plaintiff waived "[t]he Deliberate Indifference claim as it applies to Defendant Daley in his individual capacity…". (Doc. 54 at 44). This claim encompasses both the failure to provide medical attention claim and the failure to protect claim.

Nonetheless, portions of Plaintiff's response brief appear to pursue a failure to protect claim against Daley in his individual capacity. (Doc. 54 at 10-11, 40). Plaintiff argues that Daley receives and has access to all incident reports that are generated by an inmate's misbehavior, and because of Ka's extensive misbehavior while at the CCDC, Daley knew or should have known of the risk Ka posed to Plaintiff.

This argument is unavailing. While Jailer Daley did receive emails about incidents that occurred at the jail, he testified that his staff generates many incident reports daily, "hundreds of them probably in a week." (Doc. 47 at 7). Because of the sheer volume of incident reports, he does not attempt to read all of them. (*Id.*). He delegates such duties to the shift supervisors and the classification officers and relies on them to inform him of any significant issues. (*Id.* at 7-9). Consequently, this claim attempts to impose liability on Daley as a supervisor of these subordinates. Under § 1983, a supervisory official may not be held liable under a vicarious theory of recovery. *Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984); *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016). Thus the plaintiff must show the supervisor

engaged in active unconstitutional behavior, either by "encourag[ing] the specific incident of misconduct or in some other way directly participat[ing] in it." *Bellamy*, 729 F.2d at 421; *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002).

Here, there is no evidence that Daley participated, authorized, approved, or knowingly acquiesced in any alleged unconstitutional behavior. He did not participate in the classification of Ka or the classification of Plaintiff. There is no evidence in the record showing that Daley was aware of any alleged deficiencies in the jail's classification process. Thus any claim against Daley in his individual capacity is dismissed because Daley is entitled to qualified immunity.

4. <u>**While the classification and supervision procedures at the CCDC could arguably be improved, CCDC's classification and supervision procedures do not reflect "deliberate indifference."**</u>

Plaintiff asserts claims against Campbell County and Defendants in their official capacities, alleging that the classification and supervision policies of the CCDC caused his injuries because they are constitutionally deficient. A county can be sued under § 1983 for constitutional deprivations. *Monell v. Dept. of Soc. Services of City of New York*, 436 U.S. 658, 690 (1978). However, the plaintiff must first suffer a violation of his constitutional rights. As set forth above, Plaintiff suffered no constitutional violation, and thus Campbell County cannot be held liable under a § 1983 claim.

However, even if Plaintiff's constitutional rights were violated, Campbell County would still be free from liability. For a plaintiff to recover from a county defendant for a constitutional violation, the violation must be the result of some "policy or custom" attributable to the county. *Monell*, 436 U.S. at 690. Thus Campbell County must first have a "policy or custom" that directly causes its employees to be "deliberately indifferent" to a substantial risk of constitutional

injury. *Farmer*, 511 U.S. at 825. Here, the evidence does not show there was a "policy or custom" causing deliberate indifference towards Plaintiff's constitutional rights.

Plaintiff first argues that the acts of Jailer Daley as policymaker for the CCDC show a "custom or policy" of deliberate indifference. The claim against a county "implicate[s] the conduct of a defendant supervisor insofar as he acted with deliberate indifference in his official capacity as a policymaker" for the county. *Campbell v. City of Springboro*, 700 F.3d 779, 794 (6th Cir. 2012). This claim may be premised on a failure to act by the policymaker. *Essex v. County of Livingston*, 518 Fed. Appx. 351, 355 (6th Cir. 2013). Under an inaction theory, a plaintiff must establish that the policymaker exhibited deliberate indifference by failing to act despite 1) having actual or constructive knowledge of a pattern of similar constitutional violations; or 2) the fact that the constitutional violation alleged was a patently obvious and "highly predictable consequence" of the alleged inadequacy. *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 407–08 (1997).

Here, no evidence has been submitted showing that Daley or the CCDC had actual or constructive notice of a pattern of constitutional violations. The only instance Plaintiff has cited of alleged unconstitutional behavior is the incident between Ka and Plaintiff. Thus, even if Daley or the CCDC were aware of that single instance, it cannot establish a pattern giving notice of constitutional violations. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

However, a "single violation of federal rights" could trigger municipal liability. *Brown*, 520 U.S. at 409. However, the Supreme Court has held such single-incident liability only applies in a "narrow range of circumstances" when a failure to act reflects "deliberate indifference" to obvious consequences of that failure to act. *Id.* Plaintiff argues that Daley and the classification officers were aware of Ka's conduct in the CCDC and thus knew him to be a violent inmate. He

17

asserts the failure to reclassify Ka or take steps to protect other inmates from Ka was deliberately indifferent to the other inmates, as it was obvious that Ka would attack someone.

The argument is not well-taken. Daley receives hundreds of emails on a weekly basis, and only had general access to the incident reports. Ka's misbehavior occurred over nearly a five-week span, meaning that Daley would have had to pick out a pattern of misbehavior from hundreds of notices he receives with respect to a single inmate. This does not warrant a finding that Daley was on actual or constructive notice that Ka posed a risk to other inmates.

Instead, Daley relies on his classification officers to review inmate behavior and to make decisions on the classification and reclassification of inmates. The classification officers have not been named party to this lawsuit. Thus assigning liability to Daley, and thereby the County, would impose *respondeat superior* liability on the County for the alleged failure of the classification officers to reclassify Ka. As a *Monell* claim cannot be based on a vicarious theory of liability, the County cannot be held liable. *D'Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014).

Plaintiff also argues that Jailer Daley's conduct after the assault shows he ratified the classification officers' failure to reclassify Ka such that it was the policy of the CCDC. This argument fails, as it again attempts to impose vicarious liability on Daley for acts and failures to act by his classification officers. "[M]ere acquiescence in a single discretionary decision by a subordinate is not sufficient to show ratification". *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993). Instead, "[r]atification of a subordinate's action requires more than acquiescence—it requires affirmative approval of a particular decision made by a subordinate." *Id.* Here, Daley did not expressly approve of their inaction or action of classifying Ka, and thus the County cannot be held liable.

Plaintiff further argues the classification officer's failure to properly classify and reclassify Ka was in line with the policy of the CCDC, and thus the CCDC had a policy of failing to reclassify inmates. This argument also fails. To the extent Plaintiff argues that there was an unwritten policy or custom of failing to reclassify innates, the sole incident Plaintiff has cited is the current case. This does not exhibit an unconstitutional custom that the County or Jailer Daley allowed to continue, or a practice so "persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

With respect to express classification policies, courts have found deliberate indifference when there is essentially no effort to classify inmates. For example, in *Gilland*, the court found the classification system in a county jail was "rudimentary" because there was "no inquiry or investigation [] made with respect to any prior criminal record, prior prison behavior or any social or education background." *Gilland v. Owens*, 718 F. Supp. 665, 672 (W.D. Tenn. 1989). The only information used to classify inmates was the inmates current charge. *Id.* Additionally, in *Jensen*, the Eighth Circuit found prison officials who randomly assigned cell assignments, with no consideration of the inmate's size, age, or length of sentence, showed deliberate indifference toward the risk of being placed with a dangerous inmate. *Jensen v. Clarke*, 94 F.3d 1191, 1200 (8th Cir. 1996).

Here, the CCDC's policy is far different. The CCDC has written procedures that require the classification officers to do many things. The classification officer must look up the inmate on the CCDC's "JailTracker" system and the state's "CourtNet" system to find prior offenses and conduct a face-to-face interview with the inmate to ask questions about the inmate's background, including past criminal conduct and family background. (Doc. 54-11). The classification policy separates the "various categories of inmates" and requires the classification

officer to consider any history of violent or disruptive behavior. (Doc. 63-1). Rather, Plaintiff seems to assert that the classification officers did not *reclassify* Ka as required by the express policies of the CCDC. However, they have not been named party to this suit.

Plaintiff's expert finds many deficiencies in the CCDC's policy. While Plaintiff's expert is qualified, the question of deliberate indifference is a question of law. *Bishop v. Hackel*, 636 F.3d 757, 764 (6th Cir. 2011). Merely "supplying expert testimony that the [defendants'] practice is inadequate and poses a risk to inmates does not support the conclusion that the [defendants] acted with deliberate indifference...". *Perez v. Oakland County*, 466 F.3d 416, 431 (6th Cir. 2006). Deliberate indifference is a high standard, and a plaintiff generally "must show prior instances of unconstitutional conduct…". *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005). "[S]imple or even heightened negligence" is insufficient to impose municipal liability under § 1983. *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997) (quoting *Brown*, 520 U.S. at 407 (1997)).

As set forth above, there is no evidence that the CCDC has a custom or policy of deliberate indifference towards the risk of constitutional violations. Jails are naturally dangerous places, and "the problems that arise in the day-to-day operation of a corrections facility are not susceptible of easy solutions." *Bell v. Wolfish*, 441 U.S. 520, 547 (1979). Thus, officials in such facilities are accorded "wide-ranging deference" in effectuating policies that "in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Id.* The Constitution does not protect inmates from any and all risks found in a jail; rather, it requires prison officials not to be deliberately indifferent to those risks. Consequently, the Motion for Summary Judgment will be granted, dismissing the claims against Campbell County.

**III.    Conclusion**

Therefore, having reviewed this matter, and the Court being advised, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 38) be, and is hereby, **GRANTED**; and Defendants' Motion to Strike Plaintiff's Expert (Doc. 39) be, and is hereby, **DENIED**.

A separate judgment shall enter concurrently herewith.

This 24th day of January 2020.



Signed By:

_**William O. Bertelsman**_ WOB

**United States District Judge**